# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-0534V**

| | |
|---|---|
| LORI CAPOZZOLI,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: July 13, 2026 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Dorian Hurley, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On April 18, 2023, Lori Capozzoli filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccine she received on September 26, 2021. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree on a damages award.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$193,016.83,** comprised of $170,000.00 for pain and suffering, $6,592.49 for past unreimbursed expenses, and $16,424.34 for past lost wages.

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I. Relevant Procedural History

Although entitlement in this case was conceded, the parties reached an impasse in their discussions regarding damages. ECF No. 30. Petitioner thereafter filed a Motion for Ruling on the Record ("Mot.") on November 2, 2024. ECF No. 32. Respondent filed a response ("Resp.") on January 24, 2025 and Petitioner filed a reply ("Repl.") on February 27, 2025. ECF No. 33-34. I subsequently proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. ECF. No. 35. That hearing was held on June 26, 2026,[3] and the case is now ripe for a written order.

## II. Relevant Facts

### a. *Medical Records*

Petitioner received a flu vaccine in her left deltoid on September 26, 2021. Ex. 1 at 3. At the time of her vaccination, she had worked as a hair stylist for more than 30 years. *See* Ex. 8 at ¶1.

On October 12, 2021, Petitioner saw her primary care provider ("PCP") for left shoulder pain that "started a couple of hours after she received a flu shot 16 days ago." Ex. 4 at 17. On exam, she was "unable to extend her arm more than 30 degrees without significant discomfort" and had positive impingement tests. *Id*. She was referred to a sports medicine specialist and for an MRI. *Id.*

Petitioner was seen by an orthopedist on October 18, 2021. Ex. 2 at 13. She reported 7/10 pain that was worsening. *Id*. Her exam revealed "pain with extremes of ROM," flexion to 140, abduction to 110, and ER to 45 degrees. *Id*. at 14. X-rays showed a "very small amount of calcification at the supraspinatus insertion." *Id*. She was diagnosed with calcific tendinitis that the doctor thought "was exacerbated by her recent flu vaccine." *Id*. She was given a cortisone injection and referred to physical therapy. *Id*. at 15.

Petitioner began physical therapy on November 8, 2021. Ex. 2 at 23. During her initial evaluation, she reported "acute onset of L shoulder pain after receiving the flu shot" with "immediate pain." *Id*. She stated that she had difficulty working, but could not financially afford to be out of work. *Id*. Her pain that day was 1/10, but she reported her

[3] At the end of the hearing held on June 26, 2026, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

worst pain as 7/10. *Id*. at 23-24. She stated that she had two weeks of relief after the first cortisone injection, but her pain had returned. *Id*. at 24. Her exam revealed both decreased range of motion and decreased strength. *Id*. at 25. She had a second therapy session on November 22, 2021, at which she reported no change in symptoms and that her "shoulder continues to feel terrible." *Id.* at 21.

Petitioner also returned to the orthopedist that same day. *Id*. at 10. She again reported two weeks of relief from the cortisone injection. *Id.* An MRI was ordered and performed on November 30, 2021. *Id*. at 11, 27. The MRI showed tendinosis, with thickening and degeneration of the supraspinatus tendon and a small tear; subdeltoid bursal inflammation; mild tendinosis of the long head of the biceps tendon; and minimal fluid suggesting biceps tenosynovitis. *Id*. at 28. Petitioner returned to the orthopedist on December 2, 2021 to review the MRI results. Ex. 2 at 7. The doctor recommended additional physical therapy and "giving it more time." *Id*. at 8. She received a second cortisone injection. *Id.*

Petitioner began a second course of physical therapy (at a new provider) on December 13, 2021. Ex. 3 at 43. She reported left shoulder pain since her flu vaccine on September 26, 2021. *Id*. She reported that her two cortisone injections had partially improved her symptoms, but only temporarily. *Id*. She reported her pain as 2/10, and up to 10/10 at worst. *Id*. She explained that she had had to spread her hair styling appointments apart because any reaching, carrying, or lifting caused pain. *Id*. at 44. On exam, she had reduced range of motion with pain and reduced strength. *Id*. at 45-46. She attended 11 therapy sessions through February 28, 2022. *Id*. at 11-48. At her final session, she reported 0/10 pain at best and 10/10 at worst, but she still had significant pain with any resisted reaching. *Id*. at 11.

On February 28, 2022, Petitioner saw a second orthopedist for a second opinion. Ex. 5 at 8. She reported that her left shoulder pain began shortly after a vaccination the previous September. *Id*. She reported temporary relief from the two cortisone injections, but no improvement from physical therapy. *Id*. She felt that her pain had worsened over the prior two weeks. *Id*. On exam, she had "overall relatively full ROM," but positive impingement signs and mild weakness. *Id*. at 10. He noted that "her job as a hairstylist does not help with regards to being a stimulant for irritation." *Id*. at 11. He recommended anti-inflammatory medication, regular icing, and to back off from formal physical therapy and try "gravity assisted exercises/stretching" instead. *Id*.

On April 11, 2022, Petitioner saw an orthopedic surgeon. Ex. 6 at 35. She reported left shoulder pain that "started this past September 2021, directly after flu shot was injected." *Id*. at 38. She reported 4/10 pain that worsened with any movement. *Id.* The doctor believed that "initially she had a bursitis secondary to the vaccination," which "also

aggravated calcific tendinitis which was pre-existing." *Id*. at 38. He believed "a lot of her symptoms are now coming from the calcific tendinitis" and referred her to another doctor for targeted treatment. *Id*. He also refilled her prescription for diclofenac potassium. *Id.* at 39.

Petitioner saw a fourth orthopedist on May 26, 2022. Ex. 6 at 22. She rated her pain at 5/10, and 10/10 at worst. *Id*. at 24. The doctor concluded that she was a good candidate for a Tenjet procedure, which Petitioner had on July 14, 2022. *Id*. at 18-19, 25. She was doing well at her first follow-up on July 21, 2022, reporting pain of 2/10, which increased with movement, but was "not as severe." *Id*. at 13.

Petitioner returned for a follow-up visit on September 8, 2022. Ex. 7 at 38. She reported improvement for approximately five weeks after the Tenjet procedure. *Id*. at 41. An x-ray showed "80% of calcification gone." *Id*. The doctor advised that she restart conservative treatments, including anti-inflammatory medication and home physical therapy exercises. and follow up in six weeks. *Id*.

She returned on October 31, 2022 reporting "a stabbing pain that comes and goes." Ex. 7 at 34. The doctor recommended voltaren gel and ordered a second MRI, which was done on November 3, 2022. *Id*. at 35, 45. The MRI showed supraspinatus calcific tendinitis, infraspinatus tendinitis, mild AC joint osteoarthritis, and moderate bursitis. *Id*. at 46. Based on the MRI results, the doctor recommended a repeat Tenjet procedure, which Petitioner underwent on November 28, 2022. *Id*. at 21-24, 29.

Petitioner had follow up appointments on December 5 and 19, 2022. Ex. 7 at 13, 18. On December 19th, she reported worsening pain (4/10) and increased trouble with range of motion. *Id.* at 13. She was given a third cortisone injection and referred for a third MRI. *Id*. at 14. The MRI revealed a "similar degree of posterior supraspinatus and inferior infraspinatus tendinopathy" with overlying bursitis. *Id*. at 42-43. Based on the MRI, she was referred back to physical therapy. *Id*. at 8.

Petitioner returned to therapy on February 27, 2023. Ex. 9 at 39. She reported difficulty with overhead motion and "severe pain with sleeping." *Id*. Her exam was consistent with rotator cuff tendinosis and cervical radiculopathy. *Id*. at 41. She attended six sessions through April 20, 2023. *Id*. at 29-42.

Petitioner had a left arm EMG on June 21, 2023, which was normal. Ex. 9 at 14-15. Several months later, she returned to the orthopedist on November 29, 2023. Ex. 10 at 3. She reported "no change with her shoulder pain since her last visit in February." *Id*. at 6. She rated her pain at 2/10, and described it as "aching, sharp and shooting" depending on activity and worse at night while laying down. *Id*. The doctor noted normal

EMG and ultrasound[4] findings. *Id*. at 7. He prescribed gabapentin at bedtime, and recommended acupuncture or topical capsaicin. *Id*.

Petitioner went back to the orthopedist on February 5, 2024. Ex. 11 at 7. She reported 3/10 pain that was relieved by the medication, but that returned when it was discontinued. *Id.* The doctor refilled the prescription for gabapentin and again recommended acupuncture and capsaicin. *Id*. at 8. At her next visit on April 29, 2024, Petitioner reported 4/10 "aching and sharp pain" as well as loss of range of motion since stopping gabapentin and diclofenac. *Id*. at 14. She was given a refill of gabapentin. *Id*. at 15. She returned for a final time on November 4, 2024 reporting that her pain returned (4/10) after discontinuing gabapentin. Ex. 12 at 5. She was given another refill. *Id*. at 6.

b. *Affidavit Testimony*

Petitioner provided two affidavits in support of her claim. *See* Ex. 8, 13. She stated that her "shoulder and arm have never felt physically normal since the flu injection." Ex. 8 at ¶3. She also reported that her doctor informed her that there is no further treatment, other than staying on gabapentin, which is now prescribed by her PCP. Ex. 13 at ¶13. Even with the medication, she reported ongoing symptoms, including chronic pain between 3/10 and 8/10 (depending on usage) and reduced range of motion. *Id*. at ¶4.

Petitioner also described the impacts of her injury on her life, particularly her job as a hairdresser. She stated that she had a newborn grandson at the time of her injury and was unable to lift him or help her son and his family during that time. Ex. 8 at ¶3. She also was less able to help her disabled husband. *Id*. She found it difficult to drive and care for her dog. *Id*. at ¶6. She explained that her job "completely revolves around being capable of using [her] arms and shoulders all day," and that she suffered humiliation and lost income at not being able to perform at the same level as prior to her injury. Ex. 8 at ¶3, 4, 7.

## III. The Parties' Arguments

Petitioner seeks an award of $210,000.00 for her pain and suffering, plus the agreed upon awards for past unreimbursed expense and past lost wages. Mot. at 1. She argues that her SIRVA injury was "serious and debilitating," and "greatly impacted her health and wellbeing, as well as her ability to function at her job." *Id.* at 9. She bases her damages request on treatment including two surgeries, prescription pain medications, three MRIs, three cortisone injections, and multiple rounds of physical therapy, "none of which provided her with lasting relief." *Id*. at 12. Petitioner argues that her Tenjet procedures are equivalent to arthroscopic surgeries because they required an incision

[4] No record of an ultrasound was filed.

with a tool inserted to perform internal work on the shoulder. *See* Repl. at 3-4. Finally, Petitioner points to her consistent reports of high levels of pain and the ongoing nature of her symptoms to the present (almost five years after vaccination) to support her damages request. Mot. at 13; Repl. at 6.

During the Motions Day hearing and in her brief, Petitioner discussed prior SIRVA cases that involved injured claimants obtaining awards above $200,000.00 in pain and suffering, and argued that an award of $210,000.00 in pain and suffering was reasonable and appropriate in comparison. Mot. at 14-17. Petitioner also distinguished the cases cited by Respondent by noting that each involved only one surgical procedure. Repl. at 5.

### a. Respondent

Respondent argues that an award of $140,000.00 in pain and suffering is reasonable and appropriate in this case. Resp. at 10. He bases his recommendation on Petitioner's treatment of "prescriptions for diclofenac and gabapentin, three cortisone injections, nineteen PT sessions, and two TenJet procedures over the course of approximately three years." *Id*. He notes that Petitioner had shoulder conditions that were not related to her SIRVA, including calcific tendinitis and osteoarthritis, and questions whether her TenJet procedures "were attributable to her SIRVA, as they were indicated to treat her pre-existing calcific tendinitis and remove calcific densities." *Id*. He argues that TenJet procedures are "distinguishable from arthroscopic and open shoulder surgeries that involved extensive repairs and debridement, can result in significant post-operative pain, and require intensive recovery." *Id*. at 11.

Respondent also distinguishes Petitioner's cited prior SIRVA cases, noting that all of them had significantly more treatment than did Petitioner, including surgeries, cortisone injections, and PT. Resp. at 13-17. Respondent cited three prior SIRVA cases that involved injured claimants who were awarded $135,000.00 in pain and suffering to support his proposed damages award. *Id*. at 17-19.

## IV. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined

to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain

and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

## V. Prior SIRVA Compensation Within SPU[5]

### A. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, 4,545 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,397), with the remaining 148 cases dismissed.

2,506 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[6] In only 270 of these cases, however, was the amount of damages determined by a special master in a reasoned decision.[7] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[8]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 1,891 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,206 cases) or stipulation (30 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[8] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

| | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[9] Agreement |
|---|---|---|---|---|
| **Total Cases** | *270* | *2,206* | *30* | *1,891* |
| **Lowest** | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| **1st Quartile** | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| **Median** | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 270 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $30,000.00 to $215,000.00, with $87,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[10] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[11]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs*., No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[11] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs*., 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VI. Appropriate Compensation in this Case

When making a determination of pain and suffering, I review the entire record, including all filed medical records and affidavits, as well as all assertions made by the parties in written documents and during oral argument. I also consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the personal circumstances of this case.

In this case, the parties do not dispute that Petitioner was aware of her injury and of her pain and suffering during her course of treatment. The filed records reveal a long treatment course, with consistent treatment for approximately 18 months, and then more sporadic for another approximately 18 months, for a total of just over three years. During this period, Petitioner was prescribed medications, had three cortisone injections, had three MRIs, x-rays, and an EMG, underwent two TenJet procedures, and had 19 sessions of physical therapy. *See generally* Ex. 2 at 8, 13, 21-23, 27-28; Ex. 3 at 11-48; Ex. 6 at 18-19; Ex. 7 at 14, 21-24, 29, 42-43; Ex. 9 at 14-15, 29-42. Petitioner alleged that she had continued to experience pain and limitation in her shoulder through the present – a period of almost five years. Mot. at 13; Ex. 13 at ¶3-4. Overall, Petitioner's treatment course reveals a moderately severe SIRVA injury – with two procedures and a fairly long duration.

The parties disagree about the appropriate pain and suffering to attribute to Petitioner's TenJet procedures, which share similarities and differences with arthroscopic surgery. Petitioner argued that the TenJet procedures should be equivalent to arthroscopic surgery because they involved the insertion of a medical device into an

incision in the shoulder to perform internal modifications. Respondent argued that while the TenJet procedures are literally "surgical," they involve only a single incision, are performed under local anesthesia, take only a short period of time, and require less follow-up care for recovery. Further, Respondent notes that the TenJet procedures are treatment for calcifications in Petitioner's shoulder, comorbid conditions not attributable to a SIRVA injury. To support their arguments, both parties provided appropriate comparable prior SIRVA cases. Petitioner, for example, cited cases in which claimants underwent multiple surgeries over a long treatment period. *See* Mot. at 14-17. In contrast, Respondent cited cases in which claimants underwent one surgery. *See* Resp. at 17-19.

I find Petitioner's situation to be most similar to the claimants in *Edwards v. Sec'y of Health & Human Servs.*, No. 21-0056V, 2023 WL 6847484 (Fed. Cl. Spec. Mstr. Sept. 11, 2023) and *Rice-Hansen v. Sec'y of Health & Human Servs.*, No. 20-1338V, 2022 WL 18339478 (Fed. Cl. Spec. Mstr. Dec. 9, 2022). In *Edwards*, I awarded $173,000.00 in pain and suffering to a claimant who underwent a manipulation under anesthesia plus an arthroscopic surgery, had two MRIs and two cortisone injections, and went to 53 physical therapy sessions over an 18-month period. *Edwards*, 2023 WL 6847484 at *3-4. In *Rice-Hansen*, I awarded $175,000.00 in pain and suffering to a petitioner who underwent an arthroscopic surgery and a manipulation under anesthesia, received prescription medication and one cortisone injection, and participated in 40 physical therapy sessions in just over two years. *Rice-Hansen*, 2022 WL 18339478 at *10. While Petitioner had a longer course of treatment, she underwent far less physical therapy than either claimant and had other factors, such as calcific tendinitis, which contributed to her pain and suffering, suggesting that a slightly lower award is appropriate.

Overall, considering the arguments presented by both parties at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$170,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.

The other sums in this case demanded by Petitioner - $6,592.49 for past unreimbursed out-of-pocket expenses, and $16,424.35 for prior lost wages (Mot. at 19) – are not disputed by Respondent. *See* Resp. at 20. Hence, both will be awarded without adjustment.

## Conclusion

In light of all of the above, I award **Petitioner a lump sum payment of <u>$193,016.83</u>, comprised of $170,000.00 for pain and suffering, $6,592.49 for past unreimbursed expenses, and $16,424.34 for past lost wages, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.